**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CORSAIR SPECIAL SITUATIONS | : | |
| FUND, L.P., | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:11-CV-1980 (JCH) |
| v. | : | |
| | : | |
| ENGINEERED FRAMING SYSTEMS INC., | : | SEPTEMBER 26, 2013 |
| et al., | : | |
| Defendants. | : | |

**RULING RE: PLAINTIFF'S MOTION FOR TURNOVER ORDER (Doc. No. 33), THIRD PARTIES' MOTION FOR LEAVE TO FILE SUR-REPLY (Doc. No. 48), AND THIRD PARTIES' MOTION FOR LEAVE TO FILE SUPPLEMENTAL MEMORANDUM AND REQUEST FOR EVIDENTIARY HEARING (Doc. No. 71)**

**I.    INTRODUCTION**

Plaintiff Corsair Special Situations Fund, L.P. ("Corsair") brought this action to enforce a judgment from the District of Maryland (the "Judgment") against Engineered Framing Systems, Inc., EFS Structures, Inc. ("EFS"), John J. Hildreth ("Hildreth"), and Marie N. Hildreth (collectively, the "defendants"). Based on discovery in aid of enforcement, Corsair concluded that entities in Connecticut owed money to EFS for a construction project in Edgewater, New Jersey (the "Edgewater Project"). Corsair subsequently registered the Judgment in the District of Connecticut and served a Writ of Execution (the "Writ") on at least some of these third parties.

Corsair now moves the court to order the following third parties (collectively, the "third parties") to deposit with the court funds paid to or on behalf of EFS in violation of the Writ:  National Resources; National Re/Sources Investments, LLC ("National Re/Sources Investments"); i.Park, LLC ("iPark"); iPark Edgewater, LLC ("iPark Edgewater"); One Main Street, LLC ("One Main Street"); Hudson View Associates, LLC

("Hudson View"); and Westchester Industries, Inc. ("Westchester Industries").  The third

parties move for leave to file a Sur-Reply in Opposition.

On August 20, 2013, the court held a hearing on the Motion for Turnover Order.

On September 13, over three weeks later, the third parties moved for leave to file a

supplemental memorandum and for an evidentiary hearing.

For the reasons set forth below, the court **GRANTS** Corsair's Motion for Turnover

Order (Doc. No. 33) and the third parties' Motion for Leave to File a Sur-Reply (Doc. No.

48).  The court also **GRANTS in part and DENIES in part** the third parties' Motion for

Leave to File a Supplemental Memorandum and Request for Evidentiary Hearing (Doc.

No. 71).

## II.    BACKGROUND

### A.    The Writ and the Third Parties

On June 9, 2010, a federal court in the District of Maryland awarded Corsair,

inter alia, monetary damages against the defendants in the amount of $4,875,000.00,

plus six percent interest from June 30, 2008 through the date of the Judgment.  See

Corsair Special Situations Fund, L.P. v. Engineered Framing Sys., Inc., No. 09-1201-

PWG, 2010 WL 2367390 (D. Md. June 9, 2010), aff'd, 442 F. App'x 66 (4th Cir. 2011).

The Judgment was registered in the District of Connecticut on September 29, 2011.

See Pl.'s Mot. for Turnover Order ("Pl.'s Mot.") (Doc. No. 33) at ¶¶ 1-2.  On September

30, a state marshal served the Writ of Execution (the "Writ") issued by this court on

Lynne Ward at a Greenwich, Connecticut business address out of which the third

parties operate.  See Third Parties' Ex. T (Doc. No. 42-3) at 33.

The Writ directs third parties to deliver to the marshal property in their possession

owing to the judgment debtors.  See Doc. No. 5.  It does not require identification of the

third parties on whom it is served, nor does it include a space to list such parties.  See id.  In this case, however, the Writ was served along with interrogatories directed at four parties in particular.  The Execution on Property thus states that—through service on Ward—the marshal made demand on National Resources, National Re/Sources Investments, iPark, and iPark Edgewater.  See Third Parties' Ex. T.

Corsair brings the present Motion, not only against these four parties, but against three others not named in the marshal's Execution on Property:  One Main Street, Hudson View, and Westchester Industries.  National Resources is not itself a legal entity; it is a "d/b/a" under which all the third parties operate.  The remaining third parties are legal entities conducting business under the National Resources name.  At least three of these entities appear to be citizens of Connecticut.[1]

B.   Payments to EFS

In November 2010, EFS entered into a contract (the "Contract") to perform work on the Edgewater Project.  See Pl.'s Ex. D (Doc. No. 33-4).  The Contract appears, on its face, to be with National Resources, which is listed as the owner of the Edgewater Project.  See id.  Other evidence supports that appearance.  The structural drawings identify National Resources as the client.  See Pl.'s Ex. B (doc. No. 33-2).  EFS's bid was accepted on behalf of "National RE/sources" by Dan Burton, who also signed the Contract.  See Pl.'s Ex. C (Doc. No. 33-3).  All but three of the fifty-four invoices before the court for EFS's work on the Edgewater Project are billed to National Resources and

---

[1] Hudson View is a Connecticut LLC.  See Pennessi Aff. at 2 n.1.  Westchester Industries is a New York corporation with its principal place of business in Connecticut.  See id. at ¶ 28.  The remaining entities—National Re/Sources Investments, iPark, iPark Edgewater, and One Main Street—are Delaware LLCs.  See id. at 2 n.1.  By the third parties' own account, however, One Main Street is itself a citizen of Connecticut as well as Delaware.  See Third Parties' Opp'n (Doc. No. 41) at 19.

list National Resources as the owner of the Edgewater Project, with EFS as the contractor.  See Pl.'s Ex. E (Doc. No. 33-5).

The relationship between EFS and National Resources is not as straightforward as it appears, however, because National Resources is not itself a legal entity. According to the third parties, National Resources functions, in effect, as "the trade name of a cluster of companies," including the three LLCs listed in the marshal's Execution on Property.  See Pennessi Aff. (Doc. No. 42) at ¶ 26.  Attorney Pennessi, who is in-house counsel for all of the companies operating under the National Resources banner, states that the Contract formed on its face between EFS and National Resources was, in fact, formed between EFS and One Main Street.  Id. at ¶ 16.  The Contract, which identifies National Resources as the owner, lists One Main Street as the contractor, with EFS as the subcontractor.  See Pl.'s Ex. D.  The three invoices not billed to National Resources are billed to One Main Street and list One Main Street as the owner, with EFS as the architect.  See Pl.'s Ex. E.

Like all of the third parties, One Main Street does business out of the address at which the marshal served the Writ on Ward.  Id. at ¶ 28.  At the time of service, Ward was a member or principal of some of the entities doing business as National Resources, although there is some factual dispute as to whether she owned or was otherwise a member of One Main Street.  Id. at ¶ 29.[2]

---

[2] According to Joseph Cotter, who was deposed as the corporate designee for National Resources, Ward and Cotter co-owned One Main Street.  See id. Cotter Dep. (Doc. No. 33-7) at 34.  As in-house counsel for National Resources, Attorney Pennessi identified iPark Edgewater as "a member" of One Main Street in his Affidavit, but he did not rule out the possibility that Ward was also a member.  See Pennessi Aff. at ¶ 32.  Nevertheless, in their Sur-Reply, the third parties alleged that Ward was not an owner of One Main Street.  See Third Parties' Sur-Reply (Doc. No. 48-1) at 3.  At the hearing, counsel for the third parties stated that evidence could be produced to prove that allegation.  However, when

4

On any reading of the facts, service of the Writ on Ward was directed at National Resources.  Nevertheless, subsequent to service of the Writ, entities operating under the National Resources banner made payments to or on behalf of EFS.  See Pl.'s Mot. at ¶ 7.[3]  From October 2011 through June 2012, these payments totaled $2,308,504.  See id.; Pl.'s Ex. F (Doc. No. 33-6).  Attorney Pennessi, who bore responsibility for responding to the Writ on behalf of National Resources, has represented that, in response to the Writ, National Resources secured an indemnification agreement from Hildreth to protect all of the National Resources entities connected to the Edgewater Project.  See Pennessi Dep. (Doc. No. 33-10) at 63-64.  Attorney Pennessi has also represented that One Main Street made the payments in question after "becoming convinced that it did not have any obligation under the writ."  Pennessi Aff. at ¶ 31.

## III.    LEGAL STANDARD

Under the Federal Rules of Civil Procedure, "[a] money judgment is enforced by a writ of execution, unless the court directs otherwise.  The procedure on execution— and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."  Fed. R. Civ. P. 69(a)(1).

In Connecticut, "[t]he law of turnover orders is entirely statutory."  Sarasota CCM, Inc. v. Golf Mktg., LLC, 94 Conn. App. 34, 37-38 (2006).  Under section 52-356b of the Connecticut General Statutes, courts may issue a turnover order after notice and a

---

pressed, counsel also conceded that Ward indirectly owns One Main Street, because she owns entities that, in turn, own One Main Street.

[3] Indeed, whether One Main Street owned the Edgewater Project, as the third parties allege, payments to EFS came largely from an account in the name of another National Resources entity, Hudson View, of which Ward and Cotter are both principals.  See Pl.'s Mem. in Supp. of Mot. ("Pl.'s Mem.") (Doc. No. 33-13) at 5; Cotter Dep. at 33-34; Schuyler Dep. (Doc. No. 33-12) at 47.

hearing upon a showing of need.  See Conn. Gen. Stat. § 52-356b.  The legal standard

for turnover orders is not sharply delineated because the governing state statutes have

not been the subject of much judicial interpretation.  See Sarasota CCM, 94 Conn. App.

at 38; Choice Hotels Int'l, Inc. v. Klein, No. FSTCV114020107, 2011 WL 5925081

(Conn. Super. Ct. Nov. 7, 2011) ("Neither party has provided any authority defining

'need' as used in Section 52–356b(b) and there does not seem to be much judicial

interpretation available on the subject.").

## IV.    DISCUSSION

In this post-judgment proceeding, Corsair seeks to compel the third parties to

deposit with the court the amount paid to or on behalf of EFS subsequent to service of

the Writ on Ward, so that this amount may then be turned over to Corsair.  The third

parties oppose Corsair's Motion for Turnover Order on two grounds:  (1) service on

Ward was insufficient as to One Main Street, the real party in interest, see Third Parties'

Opp'n (Doc. No. 41) at 14-21; and (2) the EFS under contract with the third parties was

not the same EFS named in the Maryland judgment, see id. at 22-29.  The court

determines, however, that in-hand service on Ward was sufficient as to all of the third

parties within the "National Resources" cluster, including One Main Street, and that EFS

was recognizably one and the same entity as the judgment debtor.

Furthermore, given the third parties' conduct—particularly, their deliberate choice

to secure indemnification for payments to EFS rather than comply with the Writ—the

court determines that Corsair has made the required showing of need for a turnover

order to issue in this case.

A.     Service On Ward Was Sufficient As To All National Resources Entities.

1.     In-Hand Service on a Managing Member

While Connecticut law requires the levying officer to serve the judgment debtor

personally, the manner of service on third parties is not dictated.  See Conn. Gen. Stat.

§ 52-356a(a)(4).  With respect to a judgment debtor like EFS that is not a natural

person, section 52-356a provides only that the levying officer shall serve a copy of the

execution on third persons in possession of the debtor's property.  See Conn. Gen. Stat.

§ 52-356a(a)(4)(B).

In the postjudgment context more generally, Connecticut law provides:

> [S]ervice of process . . . may be made (1) by a proper officer sending a
> true and attested copy [of legal papers concerning the postjudgment
> proceeding] by certified mail, return receipt requested, to a person at his
> last-known address, or (2) as provided for service of process by chapter
> 896, or (3) as provided by rule of court for service on an appearing party if
> made on a party who has filed a postjudgment appearance or if made
> within one hundred eighty days of rendition of judgment on a party who
> has appeared in the action.

Conn. Gen. Stat. Ann. § 52-350e(a).[4]

Like several of the entities within the National Resources cluster, One Main

Street is an LLC.  Chapter 896, which governs service of process in state civil actions,

does not specifically address service on LLCs.  In state civil actions against

corporations, partnerships, and voluntary associations, service may be made on certain

officers or principals or on a registered agent for service.  See Conn. Gen. Stat. § 52-57.

Outside the postjudgment context, the Connecticut statutes governing LLCs provide for

---

[4] Section 52-350e does not displace provisions regarding specific postjudgment procedures
under sections 52-351a, 52-351b, 52-356a, 52-356b, and 52-361a.  See Conn. Gen. Stat. Ann. § 52-
350e.  As already noted, section 52-356a, which governs execution against property of the judgment
debtor, requires the judgment debtor to be served personally, but does not dictate the mode of service
applicable to third parties in possession of property belonging to the judgment debtor.

service to be made on a manager or a member in whom management of the LLC is vested.  See Conn. Gen. Stat. § 34-105(d).  Likewise, with respect to ordinary civil actions in federal court, Rule 4 permits service on an LLC to be made by in-hand service on an officer, managing or general agent, or other agent authorized by appointment or law to receive service.  See Fed. R. Civ. P. 4(h)(1)(B).  Under Connecticut's two long-arm statutes, foreign corporations, partnerships, and voluntary associations that transact business in the state but lack a registered agent for service may be served by alternative means, including by serving the Connecticut Secretary of the State.  See Conn. Gen. Stat. §§ 52-59b & 33-929.

The third parties argue—incorrectly, in the court's view—that, under Connecticut law, the sole means of service on a foreign LLC is through its statutory agent or, if no statutory agent is appointed, through the Connecticut Secretary of the State.  See Third Parties' Opp'n at 26-27.  Under Connecticut law, LLCs transacting business in the state are required to appoint a statutory agent for service, regardless of whether they were formed under the laws of Connecticut or another jurisdiction.  See Conn. Gen. Stat. §§ 34-104(a) & 34-224(a).  Likewise, whether foreign or domestic, an LLC "may" be served through its statutory agent for service.  See Conn. Gen. Stat. §§ 34-105(a) & 34-225(a).  Sections 34-105(e) and 34-225(d) are explicit that service on a statutory agent is only one valid mode of service, which does not exclude other such modes.[5]  Indeed, the Connecticut Appellate Court has construed these two sections to hold that "there is no exclusive means for service on a limited liability company," regardless of whether the

_____

[5] Each section reads:  "Nothing contained in this section shall limit or affect the right to serve any process, notice or demand required or permitted by law to be served upon a limited liability company in any other manner permitted by law."  Conn. Gen. Stat. §§ 34-105(e) & 34-225(d).

LLC is domestic or foreign.  Little v. Mackeyboy Auto, LLC, 142 Conn. App. 14, 20 & n.3 (2013); but see Pasquariello Elec. Corp. v. Nyberg, No. CV085024983, 2009 WL 3739445 (Conn. Super. Ct. Oct. 7, 2009).

The court agrees with the third parties that where, as here, a foreign LLC fails to appoint a statutory agent, service on the Connecticut Secretary of the State is also authorized in accordance with the procedure specified in section 52-59b, one of the two state long-arm statutes.[6]  The court rejects the position of the third parties, however, that section 52-59b dictates the exclusive means of effecting service on an LLC, such as One Main Street, that lacks a statutory agent.  It would be strange, indeed, for the state to permit in-hand service on a managing member of a domestic LLC, which mode of service is far likelier to apprise the LLC of pending litigation, and yet to require service on a foreign LLC to be made either through a statutory agent or, if none, through the Connecticut Secretary of the State, which modes of service carry far less chance of effecting actual notice of the lawsuit.

In support of the position that service on the Connecticut Secretary of the State was required in the present case, the third parties argued at the hearing that section 34-105, which permits service on a managing member, applies only to domestic LLCs. The third parties' reading of section 34-105 is based on the statutory definition of a foreign LLC as an LLC organized under the laws of another jurisdiction.  See Conn. Gen. Stat. § 34-101(10)(A).  Section 34-101, however, does not exempt foreign LLCs from compliance with sections 34-100 through 34-242, inclusive.  See Conn. Gen. Stat.

---

[6] Like the rest of chapter 896, section 52-59b does not address LLCs specifically.  However, in the absence of express legislative action or authoritative interpretation by the Connecticut Supreme Court, Judge Kravitz concluded, after a thorough examination of the issue, that section 52-59b applies to LLCs.  See Austen v. Catterton Partners V, LP, 729 F. Supp. 2d 548, 557 (D. Conn. 2010).

§ 34-101(10)(C).  On the court's reading, the plain statutory language offers no basis to limit section 34-105 to domestic LLCs.

The evident purpose of sections 34-224 and 34-225, which address <u>foreign</u> LLCs, is to supplement, not displace, other modes of service on LLCs generally. Section 34-224, for example, adds the Connecticut Secretary of the State to the list of permissible statutory agents, and section 34-225 specifies the procedures by which service on the Secretary of the State is to be made, where the Secretary has been appointed as an LLC's statutory agent.  <u>See</u> Conn. Gen. Stat. §§ 34-224(b) & 34-225(b).  Nothing in section 34-225, however, requires that service be made through the foreign LLC's statutory agent, regardless of whether that agent is the Connecticut Secretary of the State.  As already noted, <u>supra</u>, section 34-225(d) unequivocally states that service on a statutory agent is not exclusive of other authorized modes of service. <u>See also</u> <u>Little</u>, 142 Conn. App. at 20 n.3.

Unlike section 34-225, section 52-59b (the long-arm statute applicable to LLCs) does not contain a clause relating to other modes of service.  <u>See</u> Conn. Gen. Stat. § 52-59b.  Section 52-59b is similar, however, in that it provides an additional, rather than exclusive, means of service.  Like section 34-225, section 52-59b authorizes service in certain cases to be made on the Connecticut Secretary of the State.  It also does so in permissive, non-exclusive terms and is prescriptive only in relation to the <u>manner</u> in which such service must be made, where a party avails itself of the option.[7]  <u>See</u> 52-

---

[7] Section 52-59b reads, in relevant part:

Any nonresident individual, foreign partnership or foreign voluntary association, or the executor or administrator of such nonresident individual, foreign partnership or foreign voluntary association, over whom a court may exercise personal jurisdiction, as provided in subsection (a) of this section, shall be deemed to have appointed the Secretary of the State as its attorney and to have

59b(c).  Connecticut courts have repeatedly construed section 52-59b(c) as <u>not</u> ruling out other means of service permitted by law.  <u>See, e.g.</u>, <u>Dime Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, No. X05CV094017091S, 2010 WL 760441, at *16 (Conn. Super. Ct. Jan. 15, 2010); <u>Belinda v. Szymanski</u>, No. CV065003562S, 2008 WL 4527825, at *1 (Conn. Super. Ct. Sept. 10, 2008) (citing <u>Anderson v. Schibi</u>, 33 Conn. Supp. 562 (Super. Ct. 1976)); <u>Ruocco v. Metro. Boston Hockey League</u>, No. CV074024835S, 2007 WL 4635000, at *12 (Conn. Super. Ct. Dec. 7, 2007).

Neither section 52-59b nor section 34-225 precludes, then, otherwise valid in-hand service on an in-state manager of a foreign LLC.  While it may be less common for a foreign LLC to have a managing member present in the state, in-hand service on such a member is effective under Connecticut law, regardless of whether the LLC was formed under the laws of this or another jurisdiction.  Hence, under the state law of service on LLCs as well as the Federal Rules of Civil Procedure, service on Ward was sufficient as to any LLC over which she had managing authority at the time of service.

The evidence before this court convincingly supports the finding that Ward had such authority over at least some of the third parties.  By all accounts, Ward is a co-

---

agreed that any process in any civil action brought against the nonresident individual, foreign partnership or foreign voluntary association, or the executor or administrator of such nonresident individual, foreign partnership or foreign voluntary association, <u>may</u> be served upon the Secretary of the State and shall have the same validity as if served upon the nonresident individual, foreign partnership or foreign voluntary association personally. The process <u>shall</u> be served by the officer to whom the same is directed upon the Secretary of the State by leaving with or at the office of the Secretary of the State, at least twelve days before the return day of such process, a true and attested copy thereof, and by sending to the defendant at the defendant's last-known address, by registered or certified mail, postage prepaid, return receipt requested, a like true and attested copy with an endorsement thereon of the service upon the Secretary of the State. The officer serving such process upon the Secretary of the State shall leave with the Secretary of the State, at the time of service, a fee of twenty-five dollars, which fee shall be taxed in favor of the plaintiff in the plaintiff's costs if the plaintiff prevails in any such action. The Secretary of the State shall keep a record of each such process and the day and hour of service.

Conn. Gen. Stat. § 52-59b(c) (emphasis added).

owner and member or principal of some, if not all, of the National Resources entities. See Pennessi Aff. at ¶ 19; Cotter Dep. (Doc. No. 33-7) at 33-34, 39.  While an owner need not necessarily possess managing authority, the circumstances here do not reflect passive ownership.  On the contrary, the fact that Ward was present at the business address of National Resources at the time of service implies her involvement with day-to-day operations.  In addition, National Resources itself was at one point a separate LLC, of which Ward was a co-owner, and over which she may well have had explicit managing authority.  See Cotter Dep. at 15-16.  Likewise, Hudson View—the Connecticut LLC in whose name the bank account responsible for the majority of the payments to EFS appears—is co-owned by Ward, whom the Connecticut Secretary of the State lists as the LLC's Vice President.  See id. at 33-34; Schuyler Dep. (Doc. No. 33-12) at 47.

Under Connecticut law, the test for adequacy of service is "reasonable probability of notice, not actual notice."  Hartley v. Vitiello, 113 Conn. 74 (1931).  Service on Ward meets that test here.

Were Ward not authorized to accept service on behalf of any of the National Resources entities, the third parties served by name should long ago have raised that objection.  Indeed, the time to do so was in the period immediately following service on Ward in September 2011, before over a year of discovery occurred in this case, including responses to interrogatories, compliance with production requests, and participation in depositions by the third parties.  See Doc. Nos. 14.  Under federal and state procedure alike, a party that fails to timely assert insufficient service by a proper motion is deemed to have waived its objection.  See Fed. R. Civ. P. 12(h); Conn.

Practice Book § 10-32; Lostritto v. Cmty. Action Agency of New Haven, Inc., 269 Conn. 10, 32 (2004).

The court, therefore, determines that in-hand service on Ward was sufficient at least as to the third parties on whom the marshal made express demand:  National Resources, National Re/Sources, iPark, and iPark Edgewater.

2.     The National Resources Cluster

The second issue raised by the third parties is that service on Ward was not directed by name to certain of the third parties against whom Corsair now seeks a turnover order.  Among the third parties not named in the return of service is One Main Street, which is alleged to be the real party in interest in the Contract with EFS. However, all of the third parties do business as National Resources, which was specifically named in the marshal's Execution on Property.  On a careful review of the record, the court concludes that several circumstances present here make it appropriate to deem service on Ward sufficient as to all of the entities operating under the National Resources banner.

a.     The Nature of the Writ

First, the Writ does not require the third parties served to be identified by name. Under Connecticut law, a property execution need only include: (1) the names and last-known addresses of the judgment creditor and debtor; (2) the issuing court, date, original amount, and outstanding amount of the Judgment; (3) notice to any person served with the Writ that the judgment debtor's nonexempt personal property is subject to levy; and (4) notice to third persons of the manner of compliance.  See Conn. Gen. Stat. § 52-356a(a)(2).  The Writ issued by this court was in conformity with state law. The fact that the Writ was served simultaneously with interrogatories addressed to only

13

some of the third parties does not limit the Writ's broad direction to third parties in possession of property belonging to the judgment debtor to deliver that property to the levying officer.

    b.  Concentrated Ownership and Control

  Second, although, in some cases, legal ownership of the National Resources entities is vested in other entities, Ward and Cotter jointly own and exercise substantial control over the cluster itself, and many of the entities are single-purpose financing vehicles having no employees and no members apart from Cotter and Ward.  See Cotter Dep. at 15-16, 21-22, 33-34, 38-40.  All of the entities operate out of the same business office and have the same in-house counsel, Attorney Pennessi, whose business card holds National Resources out to be the entity that he represents.  See id. at 35; Pennessi Dep. at 3, 13.

  There is no question, in fact, that in-hand service on Ward provided actual notice of the Writ to all of the National Resources entities; that Attorney Pennessi responded to the Writ on behalf of all the entities; and that those third parties which paid EFS did so, not out of ignorance of the Writ, but only after the Writ's scope of application had been considered, and an indemnification agreement with Hildreth was in place to protect all of the National Resources entities connected to the Edgewater Project.  See Pennessi Dep. at 30, 63-64.

    c.  Use of a Shared Trade Name

  Finally, to the extent that service was not effected on One Main Street by name, this was the foreseeable result of the third parties' collective use of a single fictitious name.  The absence of any mention of One Main Street in the marshal's Execution on Property in no way impaired the third parties' ability to identify the real party in interest

or the property in their possession at which service of the Writ on National Resources was aimed—namely, monies owed by One Main Street, among others, to EFS at the time of service.

As evidenced by the structural drawings, the Contract with EFS, and the vast majority of invoices for EFS's work on the Edgewater Project, the third parties repeatedly used, and permitted use of, the shared trade name in lieu of the name of an underlying legal entity.  In fact, the Contract lists National Resources as the owner, and One Main Street as the contractor, despite the claim that National Resources is not an entity at all, but merely the assumed name for all of the third-party entities, including One Main Street.

Under Connecticut law, use of a trade name is prohibited except in accordance with strict registration requirements.  See Conn. Gen. Stat. § 35-1.  Failure to comply with these requirements is grounds for imposing criminal sanctions.  See id.  Such failure also constitutes a per se violation of the Connecticut Unfair Trade Practices Act. See id.; Conn. Gen. Stat. § 42-110b.  Corsair does not allege here that the third parties failed to register the National Resources name in the appropriate municipalities where it conducts business, as required by state law.  However, like the Connecticut state legislature, this court is cognizant of the potential for fraud where persons conduct business under fictitious names that do not correspond to legal entities amenable to service.  That potential is multiplied where, as in the instant case, several entities do business under a group name that appears to the persons/entities dealing with it to be an entity itself.

As pertains to service, Connecticut courts have liberally applied the doctrine of misnomer and the corresponding statutory provision—section 52-123—to exercise jurisdiction in suits improperly instituted against a trade name, rather than a legal entity. See Conn. Gen. Stat. § 52-123 ("No writ . . . shall be abated, suspended, set aside or reversed for any kind of circumstantial errors, mistakes or defects, if the person and the cause may be rightly understood and intended by the court."); World Fire & Marine Ins. Co. v. Alliance Sandblasting Co., 105 Conn. 640 (1927); Am.'s Wholesale Lender v. Pagano, 87 Conn. App. 474, 477-78 (2005).[8]  A remediable misnomer is said to exist when the right party is served by the wrong name, as distinct from the situation in which the wrong party is served.  See Lussier v. Dep't of Transp., 228 Conn. 343, 350 (1994).

The third parties argue that Corsair served the wrong parties, rather than the right party by the wrong name.  Whatever merit the argument has relative to the specific LLCs served by the marshal, that argument does not apply to service on National Resources itself, which functions as the trade name of all of the entities.

In determining whether there is misnomer, and thus a circumstantial defect under section 52-123, the Connecticut Supreme Court has devised a two-part test.  See Andover Ltd. P'ship I v. Bd. of Tax Review of Town of W. Hartford, 232 Conn. 392, 397 (1995).  First, as a threshold matter, the court looks to "whether the plaintiff had intended to sue the proper party or whether it had erroneously misdirected its action."

---

[8] The liberal application of misnomer, however, cuts only one way.  Suit brought against a trade name is easily explained by the plaintiff's ignorance of the identity of the underlying entity.  Permitting a plaintiff to amend its complaint in these cases serves the broad remedial purpose of section 52-123.   See Am.'s Wholesale Lender v. Pagano, 87 Conn. App. 474, 477-78 (2005).  A plaintiff has no analogous justification for instituting suit under its own trade name, and Connecticut courts have interpreted section 52-45a to require suit to be maintained under the legal names of the parties, except where there is an extraordinary justification for not doing so and no harm to the public.  See id. at 478 (citing Buxton v. Ullman, 147 Conn. 48, 60 (1959)).

Id.  Next, the court considers three additional factors:  "(1) whether the proper defendant had actual notice of the institution of the action; (2) whether the proper defendant knew or should have known that it was the intended defendant in the action; and (3) whether the proper defendant was in any way misled to its prejudice."  Id.

The demand made on National Resources is nothing if not a classic case of misnomer.[9]  Corsair's intent to serve those third parties in privity with EFS is clear on the face of the Writ.  All of the National Resources entities had actual notice of the Writ. They not only should have known, but actually knew, which property in their possession was at issue, and they decided to pay EFS only after making inquiries of EFS and securing an indemnification agreement from Hildreth.  Any prejudice to the third parties was thus of their own making, rather than an outgrowth of defective service of the Writ.

In light of the nature of the Writ, the concentrated ownership of the National Resources cluster, and the use of a shared trade name, the court determines that the state marshal's in-hand service on Ward was sufficient as to all third parties operating out of the Greenwich address under the National Resources banner, including One Main Street.

_____

[9] Connecticut law, as predicted by this court, would deem service on National Resources sufficient for the exercise of jurisdiction, even were One Main Street the intended defendant in an ordinary civil suit improperly instituted against the trade name National Resources.  The case for finding misnomer in the postjudgment context is stronger.  The third parties point to no statutory provision requiring service on third parties in an enforcement action to be made in a party's legal name to be effective.  Unlike service of the summons in a typical lawsuit, where the state has a recognized interest in preventing the use of fictitious names for public judicial proceedings, service of a writ of execution on third parties serves primarily to notify those parties that property in their possession belonging to the judgment debtor is subject to levy.

B.     The EFS That Contracted With The Third Parties Was The Judgment
       Debtor.

Corsair argues, alternatively, that none of the third parties had property subject to

levy, because the EFS with whom they contracted is not the judgment debtor.

Supplementary proceedings, like the present enforcement action, are inappropriate for

the imposition of liability on a party not already liable.  See Peacock v. Thomas, 516

U.S. 349, 356-58 (1996); Epperson v. Entm't Express, Inc., 242 F.3d 100, 104-07 (2d

Cir. 2001).  Hence, alter ego and veil piercing claims, which shift liability from the

judgment debtor to a new party, lie outside this court's enforcement jurisdiction,

whereas fraudulent transfer claims, which seek only to disgorge property held by third-

party transferees, do not.  See Epperson, 242 F.3d at 106.

The third parties argue that this case raises questions regarding the identity of

EFS.  In the court's view, it does not.

Whether the third parties were persuaded, based on information from Hildreth,

among others, that the EFS doing work on the Edgewater Project was not the judgment

debtor, the record before the court raises no concern that the contracting party was a

new corporate entity.  Not only are the name, business address, and federal tax

identification number the same, on the face of the Contract, as those of the judgment

debtor, but the "new" EFS that the third parties allege formed the Contract with them did

not come into existence until January 2011, after EFS's bid for the Edgewater Project

was accepted in August 2010, and the Contract was signed in November 2010.  See

Pl.'s Ex. D at 1, 16; Pl.'s Reply Exs. 6 & 7 (Doc. No. 47-1) at 55, 57-58; Def.'s Ex. M

(Doc. No. 42-2).  This line of defense to postjudgment enforcement against EFS was

raised in the underlying Maryland case.[10]  It was also argued in May 2012 before the Superior Court of New Jersey, which summarily rejected the argument.  See Doc Nos. 287 & 288, in Corsair Special Situations Fund, L.P. v. Engineered Framing Sys., Inc., No. 09-1201-PWG; Pl.'s Reply Ex. 25 (Doc. No. 47-2) at 58-63.  This court likewise rejects the argument.

As the third parties rightly note, it is improper to use an enforcement action to shift liability.  See Third Parties' Opp'n at 27 (citing Epperson, 242 F.3d at 106). Epperson does not help the third parties, however, because Corsair does not seek to render a new entity liable.  Rather, the third parties are the ones now seeking to split EFS in two—despite one name, business address, and federal tax identification number—in order to immunize the "old" EFS (the judgment debtor) by interposing a "new" EFS, which did not yet exist at the time of contracting.  It was the third parties' choice to credit Hildreth's claim regarding the identity of EFS and not to resolve the matter by means of an interpleader action.  See 28 U.S.C. §§ 1335, 1397 & 2361.  The third parties, however, must also bear the consequences of that choice.  The fact that they took the additional step of indemnifying themselves for payments to EFS suggests their clear-eyed understanding regarding the risks of paying EFS rather than turning the sums due over to the levying officer.

C.    Third Parties' Supplemental Memorandum

After the court held a hearing on Corsair's Motion for Turnover Order on August 20, 2013, the third parties moved the court on September 13 for leave to file a

---

[10] In the Maryland case, Hildreth filed a Motion to Vacate Garnishment Judgment, alleging that EFS was not the judgment debtor for the same reasons alleged in this action.  See Corsair Special Situations Fund, L.P. v. Engineered Framing Sys., Inc., No. 09-1201-PWG (D. Md.), Doc. No. 287. Corsair filed a comprehensive reply to that allegation, see id., Doc. No. 292, after which Hildreth withdrew his Motion to Vacate, see id., Doc. No. 294.

supplemental memorandum.  See Third Parties' Mot. for Leave to File Supplemental Mem. ("Third Parties' Supplemental Mot.") (Doc. No. 71).  In that Motion, the third parties recapitulate arguments regarding the identity of EFS made in their Opposition brief and Sur-Reply and rejected by the court in Section IV.B, supra.  See Third Parties' Supplemental Mot. at ¶ 5.

In their Motion, the third parties also argue, in the alternative, that factual issues before the court require an evidentiary hearing.  Id. at ¶ 4.  The conditional request for such a hearing was first raised in a footnote at the end of the third parties' Opposition brief.  See Third Parties' Opp'n at 29 n.14.  In that earlier request, prior to the August 20 hearing, the third parties sought a scheduling order for an evidentiary hearing (and discovery) on the following issues:  (1) EFS's identity; (2) successor liability; and (3) whether One Main Street had any obligation to Corsair.  At the time that Corsair first made its Motion for Turnover Order in January 2013, over a year of discovery had already taken place—although not without a substantial period of noncompliance by the third parties.[11]  In the court's view, the extensive discovery to date; EFS's use of a single name, business address, and federal tax identification number; and the prior litigation of the issue of EFS's identity before the Superior Court of New Jersey as well as the District of Maryland court are sufficient grounds to reject the third parties' request for an evidentiary hearing.   Moreover, the court already held a hearing at which the

---

[11] On December 21, 2011, the court first ordered National Resources, National Re/Sources Investment, iPark Edgewater, and iPark—the four parties that the marshal served by name—to comply with Corsair's requests for production.  See Doc. No. 16.  The deadline for compliance with the court's Order was January 9, 2012.  See id.  Subsequently, on March 20, Corsair moved the court for an order of contempt against the third parties for failure to comply with the December 21 Order.  See Doc. No. 18.  On March 21, the court ordered the four parties to show cause why Corsair's Motion for Order of Contempt should not be granted and scheduled a show cause hearing for April 12.  See Doc. No. 19.  That Motion was withdrawn only in August 2012.  See Doc. No. 21.

third parties had the opportunity to present evidence.  They chose not to do so at that time.

In their Supplemental Memorandum, the third parties raise additional issues not raised previously.  In particular, the third parties allege that Corsair has failed to prove: (1) the existence and amount of the debt due at the time that the Writ was issued; and (2) the identity of the third parties that should be subject to the turnover order.  See Third Parties' Supplemental Mem. (Doc. No. 71-1) at 4-8.  The third parties argue that the court should deny Corsair's Motion on these additional grounds or, alternatively, that an evidentiary hearing is required to resolve the factual disputes.  See id. at 6-7.  The court disagrees on both counts.

As an initial matter, it bears emphasizing that the August 20 hearing was held pursuant to section 52-356b(b), which requires "notice and a hearing" prior to the court's issuance of a turnover order against a third party.  Conn. Gen. Stat. § 52-356b(b). Indeed, mindful of the statutory requirement, the court expressly calendared the August 20 hearing as a "Hearing" (not an "Oral Argument") on the pending Motion for Turnover Order.  See Doc. Nos. 68 & 69.  In the court's view, section 52-356b(b) sets out the process due in connection with a motion for turnover order, and no process beyond the statutory notice and hearing is required under Connecticut law in the present case.  The issues briefed and argued at the August 20 hearing were the two addressed at length in Sections IV.A and IV.B, supra:  (1) sufficiency of service; and (2) the identity of EFS.

Neither at the hearing, nor at any time prior, did the third parties question whether, and in what amount, they owed money to EFS on September 29, 2011, the date of this court's issuance of the Writ.  By the third parties' own account, the amount

21

sought by Corsair—$2,308,504—was paid to or on behalf of EFS subsequent to service of the Writ.  See Pl.'s Ex. F.  Certificates of payment offered by Corsair show substantial amounts payable prior to service of the Writ.  See Pl.'s Ex. E at 55.  Indeed, the latest certificates of payment before the court show more than the amount sought by Corsair as having been invoiced for work completed.   See id. at 53-54.

The record is admittedly imperfect.[12]  Objections to its deficiencies, however, are woefully late at this stage.  Moreover, the third parties provide no cause for their delay in raising these issues and proffer no evidence contradicting the invoices before the court which imply that the amount sought by Corsair was due at the time of the court's issuance of the Writ.  If evidence exists disproving that implication, such evidence has no doubt long been in the third parties' possession.  The proper course was to raise the issue in their Opposition brief, with affidavits and/or business records to show that a lesser amount was due at the time of the court's issuance of the Writ.

The Second Circuit and Connecticut cases cited by the third parties in their Supplemental Memorandum are not to the contrary.  See Third Parties Supplemental Mem. at 2.  It is true that the third parties bore no initial burden of proving the absence of a debt payable to EFS.  However, Corsair made an initial showing that the third parties contracted with EFS, that a debt was due on the Contract prior to this court's issuance of the Writ, and that sums in the amount now sought were paid to or on behalf of EFS subsequent to service of the Writ.  It fell to the third parties, therefore, to supply

_____

[12] The latest invoices are from the period ending on August 24, 2011, and those invoices bear the signature only of Hildreth (on behalf of EFS as the contractor), with no signature by the architect.  See Pl.'s Ex. E at 53-54.  A few earlier invoices were signed by both Hildreth (on behalf of EFS as the architect) and Dan Burton (on behalf of One Main Street as the contractor).  See id. at 5, 55.  The ambiguity in the Contract as to the roles played by National Resources, One Main Street, and EFS is apparent in the invoices.  See also Cotter Dep. at 31 (identifying yet another National Resources entity, Westchester Industries, as the contractor).

counterevidence.  The third parties have furnished no such evidence and have alleged—again, without evidence—only that the entire Contract sum was not yet due when this court issued the Writ.  See Third Parties' Supplemental Mem. at 6.  Whether the entire Contract sum was certified as of September 29, 2011, the third parties have presented no claim as to what, if any, portion should be excluded from the amount claimed by Corsair as having been paid in violation of the Writ.

The third parties also argue for the first time in their Supplemental Memorandum that Corsair has failed to prove which third-party entities should be subject to a turnover order.  For the reasons set forth in Section IV.A.2, supra, the court determines that all of the entities doing business as National Resources were properly subject to the Writ and that, given the exceptional circumstances of this case, a turnover order may properly be directed at all of these entities.  The third parties chose as a cluster not to comply with the Writ, on the view that the Contract was with a different EFS.  See Pennessi Aff. at ¶¶ 30-31.  The indemnification agreement was set up to protect the cluster as a whole in connection with the Edgewater Project.  See Pennessi Dep. at 63.  Despite the claim that One Main Street is the real party in interest, the third parties appeared to "own" the Edgewater Project under their collective trade name, see Pl.'s Ex. D at 1, and they paid EFS out of a bank account in the name of a National Resources entity, Hudson View, that nowhere appears on the Contract or on any invoice for work performed by EFS, see Pl.'s Exs. D & E; Schuyler Dep. at 47.

Because the court finds that the third parties have acted in concert with respect to their payments to EFS in violation of the Writ; because the amount sought by Corsair does not exceed the outstanding amount of the Maryland Judgment; and because

Corsair has proven that this amount was paid by the third parties to EFS subsequent to service of the Writ, the court determines that Corsair has made the requisite showing of need to justify the court's issuance of a turnover order in the amount sought in this case.

## V.     CONCLUSION

For the reasons stated above, the court **GRANTS** Corsair's Motion for Turnover Order (Doc. No. 33) in the amount of $2,308,504, as well as the third parties' Motion for Leave to File Sur-Reply (Doc. No. 48). The court also **GRANTS in part and DENIES in part**, as follows, the third parties' Motion for Leave to File a Supplemental Memorandum and Request for Evidentiary Hearing (Doc. No. 71):  the court **grants** leave to file the Supplemental Memorandum and, having considered the arguments therein, **denies** the third parties' request for an evidentiary hearing.

**SO ORDERED.**

Dated at New Haven, Connecticut this 26th day of September, 2013.

_____/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge
